

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MPR:EMR/RCH
F. #2019R00927

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 24, 2020

By Email and ECF

The Honorable Cheryl L. Pollak
United States Magistrate Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ivan Reyes Arzate
              Criminal Docket No. 20-30 (ERK)

Dear Judge Pollak:

      The government respectfully submits this letter in support of its motion for a permanent order of detention for the defendant Ivan Reyes Arzate. The defendant is a former Mexican Federal Police Officer and Commander of the Mexican Federal Police's Sensitive Investigative Unit ("SIU"), who abused his position by providing assistance to Mexican drug cartels in exchange for at least hundreds of thousands of dollars in bribes.

      On January 23, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with: (i) cocaine distribution conspiracy, in violation of Title 21, United States Code, Sections 841 and 846; (ii) cocaine importation conspiracy in violation of Title 21, United States Code, Sections 952 and 963; and (iii) international cocaine distribution conspiracy in violation of Title 21, United States Code, Sections 959 and 963. For the reasons set forth below, at his arraignment, the Court should enter a permanent order of detention, as no combination of conditions can secure the defendant's appearance at trial.

I.      Procedural and Factual Background

      A.      Overview

      The Mexican SIU units are comprised of U.S.-vetted Mexican Federal Police personnel working with the United States to combat narcotics trafficking, money laundering and other criminal activities. SIU officers receive direct training from the Drug Enforcement

Administration ("DEA") and the Department of Justice, including training at DEA's training facility in Quantico, Virginia. U.S. law enforcement agencies also routinely share information with U.S.-trained and trusted Mexican Federal Police personnel assigned to SIUs. SIU personnel are trusted to work with U.S. law enforcement personnel on investigations into, among other things, Mexican drugs cartels. In the course of these investigations, defendants are often arrested in Mexico and extradited to the United States for prosecution.

Between 2003 and 2016, the defendant was a Mexican Federal Police Officer assigned to SIU. Between 2008 and 2016, he was the SIU Commander, making him its highest-ranking officer. In that role, the defendant was the principal point of contact for information sharing between U.S. and Mexican law enforcement personnel assigned to the SIU. He routinely had contact with and worked collaboratively with DEA agents in Mexico City.

Evidence obtained by law enforcement has revealed that, while he was the SIU Commander in Mexico, the defendant received at least hundreds of thousands of dollars in bribes from Mexican drug cartels in exchange for providing protection for their drug trafficking activities. Among those cartels were the notoriously violent Beltran Leyva Organization (the "BLO") and El Seguimiento 39. With the defendant's corrupt assistance, these cartels conducted their criminal activity in Mexico without significant interference from Mexican law enforcement, and imported multi-ton quantities of cocaine and other drugs into the United States.

B.   El Seguimiento 39

During the relevant time period, El Seguimiento 39 was a sophisticated drug trafficking organization with a vast cocaine distribution network stretching from Colombia to the United States, including New York City. The cartel obtained cocaine from sources of supply in South and Central America and used drug transportation cells in Central America to transport cocaine into Mexico via boats, aircraft and commercial vehicles. From Mexico, the cartel's transportation network moved cocaine across the U.S.-Mexico border at ports of entry in Texas and California and then into cities throughout the United States. To date, law enforcement officers have made seizures of thousands of kilograms of cocaine and millions of dollars in drug-related proceeds connected to El Seguimiento 39.

El Seguimiento 39 built cooperative alliances with other drug trafficking organizations, including the Sinaloa Cartel, the BLO, the Cartel del Jalisco Nueva Generacion, the Cartel del Golfo and Los Zetas. As a result, the organization not only moved vast quantities of its own cocaine and marijuana into the United States, but leaders of other Mexican cartels and drug trafficking organizations relied on it to move illegal drugs into the United States.

El Seguimiento 39 used the corruption of public officials, including the defendant while he was SIU Commander, as a means and method of achieving the goals of its

drug trafficking enterprise. In exchange for these payments, the cartel obtained, among other things, safe passage for its drug shipments, sensitive law enforcement information and information about rival cartel members.

### C. The Charged Conduct

As described above, evidence obtained by law enforcement has revealed that, while he was an SIU Commander in Mexico, the defendant received at least hundreds of thousands of dollars in bribes from El Seguimiento 39 in exchange for his agreement to provide protection for the cartel's drug trafficking activities. Multiple cooperating witnesses have also confirmed that various other Mexican cartels, including the BLO, paid bribes to the defendant for his assistance, which included sharing sensitive U.S. law enforcement information with cartel leadership. The defendant carried out these crimes in close coordination with other corrupt public officials in the Mexican government.

For example, in 2016, in his role as SIU Commander, the defendant became aware of a pending DEA investigation into El Seguimiento 39. Shortly thereafter, the defendant personally met with leaders of the cartel, shared with them information about the U.S. investigation and accepted a $290,000 bribe in exchange for his assistance and the assistance of other corrupt officials.

The evidence establishing the defendant's corrupt assistance to the cartels, includes, among other things, cooperating witnesses with first-hand knowledge of the defendant's crimes and intercepted communications obtained pursuant to judicially authorized wiretaps. In addition, in 2017, the defendant admitted to law enforcement officials that he had personally met with a leader of El Seguimiento 39 in 2016. The defendant acknowledged that he knew the cartel leader was the target of an ongoing criminal investigation at the time of their meeting. The defendant further acknowledged that he had previously met with other drug traffickers, including Arturo Beltran Leyva, the former head of the BLO.

The defendant is currently completing a sentence of imprisonment in connection with a prosecution in the Northern District of Illinois, which also stemmed from the defendant's corrupt activities on behalf of Mexican drug cartels. See United States v. Reyes-Azarte, 17-CR-84 (N.D.I.L. 2017). In 2018, the defendant pled nolo contendere to obstruction of justice conspiracy and obstruction of justice, both in violation of 18 U.S.C. § 1512(c)(2), in connection with that case. The court sentenced him to 40-months' imprisonment. According to Bureau of Prisons records, the defendant was scheduled to be released from custody on January 27, 2020 and deported to Mexico soon thereafter.

As noted above, on January 23, 2020, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with: (i) cocaine distribution conspiracy, in violation of Title 21, United States Code, Sections 841 and 846; (ii) a cocaine importation conspiracy in violation of Title 21, United States Code, Sections 952 and 963; and

(iii) international cocaine distribution conspiracy in violation of Title 21, United States Code, Sections 959 and 963.

II.     The Court Should Enter a Permanent Order of Detention

   A.     Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds probable cause to believe that the person committed such offense. 18 U.S.C. § 3142(e)(3)(A). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination. See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that he does not pose a danger to the community or risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted). In any event, the government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Detention based on danger to the community must "be supported by clear and convincing evidence." 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See id. § 3142(g). At a detention hearing, the government may proceed by proffer, Ferranti, 66 F.3d at 541; United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. See [ ] LaFontaine, 210 F.3d at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal

4

> Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n. 7 (2d Cir. 2004).

Courts in this district have been troubled by private jail proposals in lieu of detention, in recognition of the Second Circuit's dim view of alternatives to confinement. See, e.g., United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (internal quotation marks and citations omitted) (private jail proposals "at best elaborately replicate a detention facility without the confidence of security such a facility instills"); United States v. Bruno, 14-CR-556 (WKF), 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) (noting that even if a defendant had the financial capacity to "replicate a private jail within his own home," among other things, the Court was not convinced that such "disparate treatment based on wealth is permissible under the Bail Reform Act"). Indeed, a recent Southern District of New York decision denied a defendant's proposal for a "very expensive form of private jail or detention," holding that "it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected." United States v. Zarrab, 15 Cr 867 (RMB), 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016) (quoting Borodin v. Ashcroft, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001)).

### B. A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, all three of the drug trafficking offenses with which the defendant is charged prescribe a mandatory minimum term of imprisonment of ten years, and, therefore, carry the presumption for detention. See id. Accordingly, the defendant bears the initial burden of showing that he is not a flight risk. For the reasons set forth below, he cannot sustain that burden.

### C. The Defendant Poses a Significant Risk of Flight

The defendant is a significant flight risk. The defendant faces a ten-year mandatory minimum sentence of prison on all three counts of the indictment. As noted above, the evidence supporting these serious charges is strong, including testimony from cooperating witnesses regarding the defendant's bribe payments from El Seguimiento 39, intercepted communications obtained via judicially authorized wiretaps and the defendant's own admissions. Given the significant jail time the defendant faces upon conviction, he has a strong incentive to flee the jurisdiction. See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond to Mexico); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum

5

combined terms of 105 years' imprisonment created potent incentives to flee); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a severe sentence" heightens the risk of flight).

Moreover, the defendant is a citizen of Mexico and has strong continuing ties to Mexico, which demonstrate his ability to flee and the significant risk that he will do so. By contrast, the defendant has no community ties to the United States or to the Eastern District of New York in particular. While the United States and Mexico have an extradition treaty, if the defendant flees, it will be extremely difficult to apprehend the defendant in Mexico, given his connections with high-level cartel members and powerful former officials who may shield him. Moreover, even if he is captured, extradition proceedings in Mexico may take years to complete, if the defendant contests his extradition. There is therefore a significant risk that the defendant's flight to Mexico would ensure he does not face justice in an American courtroom. Cf. United States v. Seif, No. CR 01-0977-PHX-PGR, 2001 WL 1415034, at *2-*3 (D. Ariz. Nov. 8, 2001) (citing defendant's connections to countries that did not have extradition treaties with the United States as a factor supporting detention); United States v. Epstein, 155 F. Supp. 2d 323, 326 (E.D. Penn. 2001) (finding defendant's extensive ties to Brazil, a country with which the United States has no extradition treaty, to be the "crucial factor" in denying bail for a defendant with "significant wealth").

The defendant's personal history and characteristics also demonstrate that he is a significant flight risk. The defendant has already been convicted in the Northern District of Illinois of obstruction of justice as a result of his corrupt assistance to Mexican drug cartels. In that case, as here, the defendant took advantage of his position of power and abused the vast resources of the Mexican Federal Police and the DEA to obtain sensitive information, which he in turn provided to drug traffickers, facilitating crimes by some of the world's most violent criminal organizations. Clearly, the defendant has no respect for public authority or the rule of law, and there is no reason to believe that the defendant would obey the Court's orders or conditions of release if it granted bail.

Finally, any proposed use of home detention and/or electronic monitoring in lieu of detention is insufficient here in light of the defendant's risk of flight described above. Such a proposal "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills." Orena, 986 F.2d at 632; see Zarrab, 2016 WL 3681423, at *10. Here, such an arrangement is wholly inadequate to ensure that this defendant will not flee from justice.

III.     Conclusion

        For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention.

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        United States Attorney

                     By:    /s/_____
                                        Michael P. Robotti
                                        Ryan Harris
                                        Erin Reid
                                        Assistant U.S. Attorneys
                                        (718) 254-7000

cc:     Defense Counsel (by email)